**COMMERCIAL CLEANING SERVICES, L.L.C., Plaintiff–Appellant,**

v.

**COLIN SERVICE SYSTEMS, INC., Defendant–Appellee.**

No. 00–7571.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 2000.

Decided Nov. 15, 2001.

Howard W. Foster, Johnson & Bell, Ltd., Chicago, IL (Clinton A. Krisolov, Krisolov & Associates, Ltd., Chicago, IL, Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York, NY, on the brief) for Appellant.

C. William Phillips, Covington & Burling, New York, N.Y. (David W. Haller, Aaron R. Marcu, Harry Sandick on the brief), for Appellee.

Before KEARSE, LEVAL, and SOTOMAYOR, Circuit Judges.

LEVAL, Circuit Judge.

Plaintiff-appellant Commercial Cleaning Services, L.L.C. (Commercial) appeals from the dismissal of its suit. Commercial brought this putative class-action suit for damages against a business competitor, defendant-appellee Colin Service Systems, Inc. (Colin), under the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. § 1964(c) (2000). The complaint alleges that Colin engaged in a pattern of racketeering activity by hiring undocumented aliens for profit in violation of Section 274 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1324(a), a RICO predicate offense. According to the complaint, Colin's illegal hiring practices enabled it to lower its variable costs and thereby underbid competing firms, which consequently lost contracts and customers to Colin. Colin moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The district court granted Colin's motion and dismissed the complaint without leave to amend, granting judgment in Colin's favor, on the grounds that (i) Commercial had no standing to sue because it did not allege a direct injury proximately caused by Colin's illegal hiring, and (ii) Commercial failed to provide a sufficiently detailed RICO case statement as required by the Connecticut district court's Standing Order in Civil RICO Cases (Standing Order).

We agree with Commercial's contentions that its allegations satisfy the proximate cause requirement for civil RICO cases

and that the deficiencies in its RICO case statement filed pursuant to the district court's Standing Order did not justify the grant of judgment in defendant's favor. We therefore vacate the judgment.

## BACKGROUND

### A. The Complaint

For the purposes of reviewing the grant of Colin's motion to dismiss, we take as true the factual allegations of Commercial's complaint, as supplemented by the RICO case statement submitted pursuant to the district court's Standing Order. *See McLaughlin v.. Anderson,* 962 F.2d 187, 189 (2d Cir.1992).

#### 1. The Parties

Commercial and Colin each provide janitorial services for commercial buildings. According to the complaint, Commercial is a small company that has bid against Colin for competitively awarded janitorial service contracts in the Hartford area. Colin operates throughout the Eastern seaboard and is described in the complaint as one of the nation's largest corporations engaged in the business of cleaning commercial facilities. The complaint was filed as a national class action on behalf of Colin's competitors.

#### 2. The "Illegal Immigrant Hiring Scheme"

The complaint alleges that Commercial and the members of the plaintiff class are victims of Colin's pattern of racketeering activity in violation of 18 U.S.C. § 1962(c),[1] referred to as "the illegal immigrant hiring scheme." The theory of the case, succinctly stated, is that Colin obtained a signifi-

---

1. Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

cant business advantage over other firms in the "highly competitive" and price-sensitive cleaning services industry by knowingly hiring "hundreds of illegal immigrants at low wages." Colin's illegal immigrant hiring scheme allows it to employ large numbers of workers at lower costs than its competitors must bear when operating lawfully. Colin allegedly pays undocumented workers less than the prevailing wage, and does not withhold or pay their federal and state payroll taxes, or workers' compensation insurance fees. The complaint refers to Colin's prosecution in 1996 by the United States Department of Justice for, among other things, hiring at least 150 undocumented workers, continuing to employ aliens after their work authorizations had expired, and failing to prepare, complete, and update employment documents.

The allegations assert that Colin is part of an enterprise composed of entities associated-in-fact that includes employment placement services, labor contractors, newspapers in which Colin advertises for laborers, and "various immigrant networks that assist fellow illegal immigrants in obtaining employment, housing and illegal work permits." The complaint neither describes how the undocumented workers allegedly hired by Colin entered the country, nor claims that Colin had knowledge of how those workers came to the United States. It alleges that Colin's participation in the affairs of the enterprise through the illegal immigrant hiring scheme violates 8 U.S.C. § 1324(a), which prohibits hiring certain undocumented aliens, and which is a RICO predicate offense if committed for financial gain. *See* 18 U.S.C. § 1961(1)(F).

### 3. *The Pratt & Whitney Contracts*

What apparently led to this lawsuit was Commercial's loss of lucrative cleaning contracts to Colin. In 1994, Commercial obtained a contract to clean Pratt & Whitney's facility at Southington, Connecticut. After successfully performing on that contract for approximately one year, however, Commercial was underbid by Colin for cleaning contracts at other Pratt & Whitney facilities in the area. The complaint alleges that, through the illegal immigrant hiring scheme, Colin could offer Pratt & Whitney and other potential customers access to "a virtually limitless pool of workers on short notice" at significantly lower prices than other firms could offer by operating lawfully. As a result, Pratt & Whitney and other large contractors for cleaning services accepted Colin's lower bids over Commercial's.

### B. Proceedings Below

Commercial's complaint requests class certification, an award of treble damages, and injunctive relief. Commercial submitted a RICO case statement with its complaint, as required by the District of Connecticut's Standing Order in Civil RICO Cases. Colin moved pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim. Before ruling on Commercial's request for class certification, the district court granted Colin's motion. The court dismissed the complaint primarily on the ground that Commercial had no standing to bring suit because its injury did not bear a "direct relation" to Colin's racketeering activity as required by *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The district court believed the perceived deficiency in Commercial's standing to bring suit was not curable. It therefore dismissed the complaint without leave to amend. The court also asserted, as an alternative justification for dismissal without leave to amend, that Commercial's RICO case statement, filed pursuant to the Standing Order, was so

insufficiently detailed as to violate the intended purpose of giving the defendant basic factual information underlying the RICO claim.

This appeal followed.

## DISCUSSION

### I. Civil RICO Standing

#### A. Standard of Review

■ We review *de novo* a district court's dismissal of a complaint under Fed. R.Civ.P. 12(b)(6). *See Stuto v. Fleishman,* 164 F.3d 820, 824 (2d Cir.1999). Dismissal of a civil RICO complaint for failure to state a claim is appropriate only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with [plaintiff's] allegations." *McLaughlin,* 962 F.2d at 190 (internal quotation marks omitted) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). In applying this standard, a court must read all well pleaded allegations in the complaint in the light most favorable to the plaintiff. *See id.; see also De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 69 (2d Cir.1996).

#### B. Proximate Cause

■ RICO grants standing to pursue a civil damages remedy to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir.1994). Commercial's appeal turns in part on whether its complaint satisfies the causation requirement.

■ RICO's use of the clause "by reason of" has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their injury, as well as a logical, or "but for," cause. *See Holmes,* 503 U.S. at 268, 112 S.Ct. 1311; *see also Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("By itself, factual causation . . . is not sufficient."). The requirement that a defendant's actions be the proximate cause of a plaintiff's harm represents a policy choice premised on recognition of the impracticality of asserting liability based on the almost infinite expanse of actions that are in some sense causally related to an injury. *See Sperber v. Boesky,* 849 F.2d 60, 63 (2d Cir.1988). In marking that boundary, the Supreme Court has emphasized that a plaintiff cannot complain of harm so remotely caused by a defendant's actions that imposing legal liability would transgress our "ideas of what justice demands, or of what is administratively possible and convenient." *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311 (internal quotation marks omitted) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed.1984)).

#### C. "Direct Relation" Test

Colin contends that the chain of causation between its alleged hiring of undocumented workers and Pratt & Whitney's decision to award cleaning contracts to Colin instead of Commercial is too long and tenuous to meet the proximate cause test of *Holmes.* The defendants in *Holmes* were alleged to have participated in a conspiracy to manipulate the value of the stock of several companies. *See Holmes,* 503 U.S. at 262, 112 S.Ct. 1311. Two broker-dealers who dealt in large amounts of the manipulated stock were put into liquidation when they experienced financial difficulties after the fraud was dis-

closed and the value of the manipulated stock precipitously declined. The Securities Investor Protection Corporation (SIPC) alleged that the defendants' securities and wire-fraud offenses amounted to a pattern of racketeering activity within the meaning of the RICO statute. It brought suit, based on a subrogation theory, on behalf of certain of the injured broker-dealer firms' customers who became unsecured creditors of the firms when the firms became insolvent. *See id.* at 270, 112 S.Ct. 1311.

▮ The *Holmes* Court applied a proximate cause test requiring a "direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268, 112 S.Ct. 1311. The "direct relation" requirement generally precludes recovery by a "plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." *Id.; see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 235–36 (2d Cir.1999) ("[T]he other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are *additional elements,* not substitutes for alleging (and ultimately, showing) a direct injury."). The Court found that the link between the customers' losses SIPC sought to recover and the defendants' stock manipulation was too remote to satisfy the direct relation test. It explained that "[t]he broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the ... customers." *Holmes,* 503 U.S. at 271, 112 S.Ct. 1311. The Court noted in contrast that the liquidating trustees suing directly on behalf of the defunct broker-dealers would have been the proper plaintiffs. *Id.* at 273, 112 S.Ct. 1311.

The Court stressed the difficulty of achieving precision in fashioning a test for determining whether a plaintiff's injury was sufficiently "direct" to permit standing under RICO. *Id.* at 272 n. 20, 112 S.Ct. 1311 ("[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." (internal quotation marks omitted)). It expressly warned against applying a mechanical test detached from the policy considerations associated with the proximate cause analysis at play in the case. *See id.* ("[O]ur use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the [policy] concerns set out in the [opinion]."). We have accordingly turned to those policy considerations explained in *Holmes* to guide any application of the Court's direct relation test. *See Laborers,* 191 F.3d at 239 n. 4 ("[T]he outer limits of the direct injury test are described more by [the *Holmes* Court's policy] concerns than by any bright-line, verbal definition."); *see also First Nationwide Bank,* 27 F.3d at 770.

### D. Evaluation of Plaintiff's Claim in Relation to the Proximate Cause Test

▮ We conclude that Commercial's complaint, when evaluated in light of these considerations, adequately states a direct proximate relationship between its injury and Colin's pattern of racketeering activity. The *Holmes* Court gave three policy reasons for limiting RICO's civil damages action only to those plaintiffs who could allege a direct injury. First, the less direct an injury is, the more difficult it becomes to determine what portion of the damages are attributable to the RICO violation as distinct from other, independent, factors. *Holmes,* 503 U.S. at 269, 273, 112 S.Ct. 1311 (discussing the difficulty of de-

termining whether customers' inability to collect from broker-dealers was the result of the defendants' stock manipulation as opposed to the broker-dealers' "poor business practices or their failures to anticipate developments in the financial markets"). Second, if recovery by indirectly injured plaintiffs were not barred, courts would be forced, in order to prevent multiple recovery, to develop complicated rules apportioning damages among groups of plaintiffs depending on how far each group was removed from the defendant's underlying RICO violation. *Id.* at 273, 112 S.Ct. 1311. Third, there was no need to permit indirectly injured plaintiffs to sue, as directly injured victims could be counted on to vindicate the aims of the RICO statute, and their recovery would fix the injury to those harmed as the result of the injury they suffered. *Id.*

### 1. Difficulty of Determining Damages Attributable to the RICO Violation

The district court found plaintiff's claim deficient on the first *Holmes* factor, because a fact finder would be required to determine whether Commercial's lost business to Colin was the result of the illegal immigrant hiring scheme as opposed to independent business reasons, such as the comparative quality of the companies' services, their comparative business reputations, the fluctuations in demand for their services, or other reasons customers might have for selecting one cleaning company over another. The district court concluded that, even if a fact finder could make such a determination, the calculation of damages attributable to the illegal immigrant hiring scheme would be "daunting, if not impossible."

The difficulty of proof identified in *Holmes,* however, was quite different from the circumstances of this case. Here, the plaintiffs bid against the defendant as direct competitors. The complaint asserts that Pratt & Whitney chose Colin because Colin submitted "significantly lower" bids in a "highly competitive" price-sensitive market. According to the complaint, Colin was able to underbid its competitors because its scheme to hire illegal immigrant workers permitted it to pay well below the prevailing wage for legal workers. Although we do not deny that there may be disputes as to whether the plaintiff class lost business because of defendant's violation of § 1324(a) or for other reasons, the plaintiff class was no less directly injured than the insolvent broker-dealers in *Holmes,* whose trustees, the Court indicated, would be proper plaintiffs. *See Holmes,* 503 U.S. at 273, 112 S.Ct. 1311. If plaintiffs can substantiate their claims, the plaintiffs may well show that they lost contracts directly because of the cost savings defendant realized through its scheme to employ illegal workers.

This theory fits our suggestion in *Sperber,* 849 F.2d at 65, where we affirmed the dismissal on proximate causation grounds of a civil RICO complaint by investors whose share values declined in the wake of the defendant's guilty plea to insider trading. Although we found the causation chain offered by plaintiffs too remote, we distinguished a circumstance where a plaintiff was a direct competitor against a defendant. *See id.* We stated that the RICO statute would grant standing if plaintiff were a "head-to-head bidder against [defendant] who lost because of [defendant's] illegally-enhanced reputation or economic power." *Id.*[2] Where, as here,

---

**2.** Colin argues that *Sperber,* a pre-*Holmes* decision of this court, has been overruled to the extent that it spoke of recovery for "damages caused only indirectly" by the defendant's activities. *Sperber,* 849 F.2d at 63. We do not see a conflict between *Sperber* and *Holmes.*

the parties have bid against each other, the difference between the lowest and second lowest bid [3] is readily discoverable. If Commercial can prove that but for Colin's lower wage costs attributable to its illegal hiring scheme, Commercial would have won the contract and would have earned a profit on it, it will have shown a proximately caused injury, compensable under RICO.

Colin objects that any reduced labor costs were due to its alleged underpayment of workers and failure to pay other employment-related costs of doing business, not its participation in the illegal immigrant hiring scheme. In other words, Colin claims that Commercial complains of an injury caused by the low wages paid to Colin's workers—and not by their immigration status. Of course, paying workers less than the prevailing wage and failing to withhold payroll taxes are not RICO predicate acts. Nonetheless, the purpose of the alleged violation of 8 U.S.C. § 1324(a), the hiring of illegal alien workers, was to take advantage of their diminished bargaining position, so as to employ a cheaper labor force and compete unfairly on the basis of lower costs. By illegally hiring undocumented alien labor, Colin was able to hire cheaper labor and compete unfairly. The violation of § 1324(a) alleged by the complaint was a proximate cause of Colin's ability to underbid the plaintiffs and take business from them.

## 2. Difficulty of Apportioning Damages Among Injured Parties

The *Holmes* Court warned that if courts did not limit recovery to injuries directly related to the RICO violation, they would be forced to devise complicated rules apportioning damages among plaintiffs at different degrees of separation from the violative acts alleged. *See Holmes*, 503 U.S. at 273, 112 S.Ct. 1311. The Court noted the difficulty of apportioning damages between the broker-dealers and customers who suffered losses when the broker-dealers became insolvent. Colin contends that its business competitors are not the only aggrieved parties who could recover under Commercial's theory and that the difficulty of apportioning damages among potential plaintiffs will be severe. Colin's response misses the point. The point made in *Holmes* was that, if damages are paid both to first tier plaintiffs—those directly injured by defendant's alleged acts—and to second tier plaintiffs—those injured by the injury to the first tier plaintiffs—then the payment of damages to the first tier plaintiffs would cure the harm to the second tier plaintiffs, and the payment of damages to the latter category would involve double compensation. Colin's answer is no answer to this point. If a defendant's illegal acts caused direct injury to more than one category of plaintiffs, the defendant may

First, the *Holmes* Court warned that by using the word "direct" it did not "necessarily use [the term] in the same sense as courts before [it] have." *Holmes*, 503 U.S. at 272 n. 20, 112 S.Ct. 1311. Second, the *Sperber* court recognized that "indirect injuries" could not be so "broad-ranging" as to violate proximate causation's "social policy decisions based on shared principles of justice." 849 F.2d at 64–65. The *Sperber* court rejected plaintiffs' argument that "the scope of liability is determined only by the foreseeability of injury." *Id.* Moreover, since *Holmes* was decided we have consistently concluded that our understanding of proximate causation described in *Sperber* comports with the Supreme Court's. *See, e.g., In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 399 (2d Cir.1994) ("*Holmes* essentially endorsed a definition of proximate cause that we had earlier adopted." (citing *Sperber*)); *First Nationwide Bank*, 27 F.3d at 769–70.

3. Commercial asserted at oral argument that it was the second bidder to Colin on at least one contract.

well be obligated to compensate different plaintiffs for different injuries. It does not follow that any plaintiff will have been twice benefitted, which was the concern in *Holmes.*

Unlike the situation in *Holmes,* Commercial and its fellow class members are not alleging an injury that was derivative of injury to others. Commercial does not seek to recover based on "the misfortunes visited upon a third person by the defendant's acts." *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311; *see also Laborers,* 191 F.3d at 238–39 ("[T]he critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct."). It claims to have lost profits directly as the result of Colin's underbidding, which it achieved through its violation of § 1324(a). *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1343 (2d Cir.1994) (holding that the value of business opportunities lost due to defendant's RICO violations is compensable); *Mid Atlantic Telecom Inc. v. Long Distance Servs., Inc.,* 18 F.3d 260, 264 (4th Cir.1994) (noting that plaintiff was not seeking to vindicate claims of customers who accepted defendant's fraudulent, ostensibly lower rates, but rather alleged "distinct and independent injuries: lost customers and lost revenues"); *see also Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir.1995). We have stated a plaintiff has standing where the plaintiff is the direct target of the RICO violation. *See Abrahams v. Young & Rubicam Inc. .,* 79 F.3d 234, 238 (2d Cir.1996); *American Express,* 39 F.3d at 400 (targets of RICO violations were competitive rivals not shareholders harmed by decrease in stock value upon exposure of scheme); *see also Mid Atlantic Telecom,* 18 F.3d at 263 (plaintiff has standing if it can show that it was a "direct target" of defendant's RICO violations). As discussed above, the theory of Commercial's claim is that Colin undertook the illegal immigrant hiring scheme in order to undercut its business rivals, thus qualifying them as direct targets of the RICO violation.

Colin raises the specter of a proliferation of civil RICO suits that would be permitted under Commercial's theory. It argues that a finding in Commercial's favor would mean that a dance club that failed to pay license fees on recordings it played, thereby decreasing its overhead costs and thereby allowing it to decrease its admission charge, would be liable not only to the copyright holder but to all the infringer's business competitors. We do not find this hypothetical problematic. First, the hypothetical competitors would still be required to overcome the hurdle of showing that their loss of business was proximately caused by the infringer's decrease in admission fees. But more importantly, once again, the concern of *Holmes* was that a violator might be obligated to pay double compensation if required to compensate those directly injured and those injured by the injury to those directly injured. It was not that a violator might be obligated to compensate two or more different classes of plaintiffs, each of which suffered a different concrete injury, proximately caused by the violation. In Colin's hypothetical, the competitors and the copyright owners would have suffered entirely separate injuries. Although there may well be other reasons such plaintiffs would lack standing, they would not be barred from bringing a RICO action because of a concern for multiple recoveries. Compensating both would not overcompensate any plaintiff.

### 3. Ability of Other Parties to Vindicate Aims of the Statute

In relation to the third *Holmes* policy factor, the Supreme Court has observed

that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in [RICO] enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), *cited in Holmes*, 503 U.S. at 270, 112 S.Ct. 1311. Colin argues that this factor weighs against Commercial's standing, because other parties, such as state and federal authorities charged with collecting unpaid taxes and workers' compensation fees, may sue to vindicate the statute. Moreover, the INS, which enforces § 1324(a), has already obtained Colin's agreement to pay $1 million for violations of the immigration laws.

Once again, Colin misses the point. If the existence of a public authority that could prosecute a claim against putative RICO defendants meant that the plaintiff is too remote under *Holmes*, then no private cause of action could ever be maintained, for every RICO predicate offense, as well as the RICO enterprise itself, is separately prosecutable by the government. In *Holmes*, those directly injured could be expected to sue, and their recovery would redound to the benefit of the plaintiffs suing for indirect injury. Here, in contrast, suits by governmental authorities to recover lost taxes and fees would do nothing to alleviate the plaintiffs' loss of profits. There is no class of potential plaintiffs who have been more directly injured by the alleged RICO conspiracy than the defendant's business competitors, who have a greater incentive to ensure that a RICO violation does not go undetected or unremedied, and whose recovery would indirectly cure the loss suffered by these plaintiffs.

## II. Violation of the Standing Order

The district court's alternative ground for dismissing the complaint was that Commercial had "grievously violated" the District of Connecticut's Standing Order in Civil RICO Cases. The Standing Order requires that a plaintiff in a civil RICO case submit a RICO Case Statement within 20 days of filing the complaint. The case statement must provide "in detail" information including, among other things, the names of the individuals, partnerships, or other legal entities constituting the RICO enterprise, the dates of the predicate acts with a description of the facts surrounding the predicate acts, and the identity of the alleged wrongdoers and victims.

The district court gave little explanation of this ground for dismissal. It is not clear whether the court understood the dismissal as justified by plaintiff's failure to furnish information relating to the claim required by a rule of law (as is the case when a court grants summary judgment because the plaintiff fails to show evidence capable of proving the elements of the claim, or grants a motion under Fed. R.Civ.P. 12(b)(6) because the facts pleaded would not constitute a violation of law), or as a sanction imposed because of plaintiff's failure to obey a court order (as might be appropriate if the plaintiff refused to appear for his deposition). *See, e.g., Valentine v. Museum of Modern Art*, 29 F.3d 47 (2d Cir.1994) (dismissing action with prejudice for plaintiff's refusal to comply with order to appear for deposition). Although either theory can justify grant of judgment to the defendant in appropriate circumstances, the circumstances presented here could not justify the entry of judgment on either theory.

We consider first the theory of insufficient information. For at least two reasons, dismissal for insufficient information was not justified. First, the Standing

Order calls for information far in excess of the essential elements of a RICO claim. On a motion for summary judgment, or for judgment as a matter of law at the time of trial, a defendant would not be entitled to judgment because the plaintiff's evidence failed to include all the "individuals, partnerships, corporations, associations, or other legal entities [that constitute] the RICO enterprise," or the identities of all "wrongdoers" and "victims." To the extent the Standing Order called for presentation of information going beyond what a plaintiff needs to present to establish a legally sufficient case, plaintiff's inability to produce it could not justify the grant of judgment to defendant.

■ A standing order of this nature may appropriately require a plaintiff to set forth the information it possesses in helpfully categorized form, as an aid to the court and to the accused defendant. But it may not make the prosecution of the action dependent on the plaintiff's ability to furnish more information than is required, as a matter of law, to prove the essential elements of the claim.

■ Second, the district court gave the plaintiff no opportunity to conduct discovery so as to fill the deficiencies in the information it provided. Although Fed. R.Civ.P. 11(b) seeks to ensure, by imposing responsibility on attorneys, that claims are "warranted" and "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," it makes clear by the latter quoted phrase that a plaintiff is not required to know at the time of pleading all facts necessary to establish the claim. *See O'Brien v. Alexander,* 101 F.3d 1479, 1489 (2d Cir.1996) (a sanction under Rule 11(b) may not be imposed for failure to make reasonable inquiry "unless a particular allegation is utterly lacking in support"). Similarly, Fed.R.Civ.P. 56(f) provides, as interpreted by court opinions, that when a party facing an adversary's motion for summary judgment reasonably advises the court that it needs discovery to be able to present facts needed to defend the motion, the court should defer decision of the motion until the party has had the opportunity to take discovery and rebut the motion. *See Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir .1995) (holding that grant of judgment was premature where plaintiff submitted properly supported Rule 56(f) request for further discovery in opposition to defendant's motion for summary judgment); *see also Hellstrom v. U.S. Dep't of Veteran's Affairs,* 201 F.3d 94, 97 (2d Cir.2000) ("The nonmoving party must have had the opportunity to discover information that is essential to [its] opposition to the motion for summary judgment. Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." (internal quotation marks and citation omitted)). Here, the district judge construed the Standing Order to justify dismissal of the action by reason of the plaintiff's failure to possess every fact needed to prove the essential elements of the claim (and more) at the time of the complaint without any opportunity for discovery. We do not think the Standing Order can possibly be intended to impose such an obligation.

■ The district court might also have understood the entry of judgment as a sanction imposed by reason of the plaintiff's violation of a court order. We have observed that the grant of judgment as a sanction for violation of a court order is an extreme and harsh remedy. *See Valentine,* 29 F.3d at 49 ("Dismissal with prejudice is a harsh remedy to be used only in extreme situations . . . ." (alteration and internal quotation marks omitted)). In general, this extreme sanction is appropriately imposed only in cases of willfulness, bad faith, or reasonably serious fault. *See Nat'l Hockey League v. Metro. Hockey*

*Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853–54 (2d Cir.1995) (defendants' "deliberate obstruction" in failing to comply with court orders justified the "potent medicine" of the entry of judgment in plaintiff's favor); *Minotti v. Lensink*, 895 F.2d 100, 103 (2d Cir.1990) (district court did not abuse discretion in dismissing action following plaintiff's failure to heed discovery orders on four separate occasions and the court's warning of the threat of dismissal). Plaintiff's failure on the first try to supply all the information called for by the Standing Order was not such an egregious, abusive disregard of a court order as would justify grant of judgment in the action.

We conclude that plaintiff's failure to furnish all the information required by the Standing Order, especially without opportunity for discovery, did not justify the grant of judgment to the defendant.

### III. Pleading the Elements of the Predicate Offense

■ We agree with Colin that Commercial's complaint was deficient in one respect. While alleging that Colin has committed "well over 100 acts of knowingly hiring illegal aliens," it failed to allege an essential element of § 1324(a)[4]—that Colin had actual knowledge that the illegal aliens it hired were brought into the country in violation of the statute. *See, e.g., Sys. Mgmt., Inc. v.. Loiselle*, 91 F.Supp.2d 401, 408 (D.Mass.2000) (dismissing civil

RICO claim predicated on violation of § 1324(a) where plaintiff did not allege that "[defendant] had knowledge of how the aliens had been brought into the United States and that they were *brought* into the United States in violation of [§ 1324(a) ]").

Although Commercial's complaint fails to allege an essential element of the RICO predicate offense, the flaw is not fatal, and can be cured by repleading.[5]

### CONCLUSION

The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.

---

**4.** Section 1324(a)(3)(A) provides:

> Any person who, during any 12–month period, knowingly hires for employment at least 10 individuals *with actual knowledge* that the individuals are aliens described in subparagraph (B) shall be fined under Title 18, or imprisoned for not more than 5 years, or both. (emphasis added).

Subparagraph (B) of the subsection describes:

> An alien described in this subparagraph is an alien who—
> (i) is an unauthorized alien ..., and
> (ii) has been brought into the United States in violation of this subsection.

**5.** At oral argument, Commercial asserted that it can allege Colin's knowledge of how the workers in question were brought into the country and that they were brought into the country in violation of § 1324(a).