Olivia MENDOZA, individually and on behalf of all others similarly situated; Juana Mendiola, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

ZIRKLE FRUIT CO., a Washington corporation; Matson Fruit Company, a Washington corporation; Selective Employment Agency, Inc., a Washington corporation, Defendants–Appellees.

No. 01–35276.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2002.

Filed Sept. 3, 2002.

Steve W. Berman & Andrew M. Volk, Hagens Berman LLP, Seattle, WA, and Howard W. Foster, Johnson & Bell, Ltd., Chicago, IL, for the appellants.

Irwin Schwartz, Law Offices of Irwin Schwartz, Seattle, WA, Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, WA, Walter G. Meyer, Meyer, Fluegge & Tenney, P.S., Yakima, WA, Terry Schmalz, Halverson & Applegate, P.S., Yakima, WA, for appellees Zirkle Fruit Co. and Matson Fruit Co.

J. Jay Carroll, Brendan Victor Monahan, Velikanje, Moore & Shore, P.S., Yakima, WA, for appellee Selective Employment Agency, Inc.

Before: BRUNETTI, TROTT, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge.

This case arises from claims that two agricultural companies leveraged the hiring of undocumented immigrants in order to depress the wages of their legally documented employees. We are called upon to decide two significant issues. First, we must determine whether, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, legally documented agricultural workers have standing to sue their employers, whom they allege depressed their salaries by conspiring to hire undocumented workers at below market wages. Second, we must consider the constitutionality of supplemental subject matter jurisdiction involving a party over whom there is no independent basis for federal court jurisdiction. The district court resolved both questions in favor of the defendants and dismissed this lawsuit on the pleadings. We reverse.

### BACKGROUND

■ Olivia Mendoza, Juana Mendiola, and the purported class ("employees") are agricultural laborers for Zirkle Fruit Company and Matson Fruit Company ("growers"), which operate fruit orchards and packing houses in Eastern Washington, the heart of Washington's fruit industry. According to the complaint,[1] the employees are "persons legally authorized to be employed in the United States." They worked for the growers "at wages that are substantially depressed because of the Illegal Immigrant Hiring Scheme." Pursuant to the scheme, Zirkle and Matson "knowingly hire workers of illegal status because the illegal workers are willing to accept wages that are significantly lower than wages would be in a labor market comprised solely of legally authorized workers." They do so "for the purpose of depressing employee wages below the levels they would otherwise be required to pay if they were unable to hire substantial numbers of illegal immigrants who, due to their economic situation and fear of asserting their rights due to their illegal status, can be easily exploited and who are therefore willing to work for depressed wages." The complaint provides substantial background and detail about the scope of the challenged scheme:

> Eastern Washington is the heart of Washington's famed apple and fruit industry. This area . . . is uniquely suited for growing fruit. . . .

> In Washington state there are more than 15,000 fruit packers and 30,000 orchard pickers of fruit. Many operations require unskilled, low-wage laborers for harvesting and packing and other related tasks requiring manual labor. While the industry now generates over $1 billion, many of these workers live in poverty.

> Defendants Matson and Zirkle operate fruit orchards and packing houses. Matson and Zirkle are motivated to keep labor costs as low as possible and, due to a variety of complex social and economic factors, the industry's demand for low-skilled workers has attracted many workers of Mexican citizenship. Many of these Mexican nationals are illegal immigrants who have been smuggled into the U.S. and/or harbored in the U.S. by relatives, friends, and the employers. Matson and Zirkle . . . knowingly hire workers of illegal status because illegal workers are willing to accept wages that are significantly lower

---

1. These facts, which are derived from the complaint, must be taken to be true because the case was dismissed on the pleadings for lack of jurisdiction and failure to state a claim. *United States v. One 1997 Mercedes E420,* 175 F.3d 1129, 1131 n. 1 (9th Cir. 1999).

than wages would be in a labor market comprised solely of legally authorized workers.

The Immigration and Naturalization Service has conducted investigations finding that as much as half the growers' workforce is employed illegally, and the growers have been targeted for "raids and other law enforcement procedures."

According to the complaint, the scheme is facilitated by Selective Employment Agency, Inc., a separate company that employs the workers and then "loans" them to the growers. "Defendants Matson and Zirkle use Selective Employment as a 'front company' for the purpose of perpetrating this scheme with the hope that each will be thus shielded from charges that they violated federal law." Although Selective Employment was named only as an association-in-fact enterprise, not as a defendant, in the federal RICO claim, the complaint alleged a state conspiracy claim that did name Selective Employment as a defendant.

The district court dismissed the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] Although the district court held that the employees pled a direct injury because there was no intervening third party from whom their injury was derived, the court dismissed the complaint on grounds that the damages were too speculative and difficult to ascertain.[3]

The employees moved for reconsideration, proffering a proposed amended complaint that alleged a conspiracy broader than the named growers and included more specific causation allegations. The amended complaint states that the growers and unnamed conspirators "comprise a large percentage of the fruit orchards and packing houses in the area, and therefore affect wages throughout the labor market for apple pickers and fruit packers, [such that] competition with respect to wages is stifled and suppressed." The proffered complaint also adds six paragraphs explaining how the scheme injures the workers. Nonetheless, the district court denied the motion, clarifying that it was not dismissing merely for difficulty of proof, but for lack of concrete injury and proximate causation.

In addition, the district court, quite reluctantly, granted Selective Employment's motion to dismiss pursuant to Rule 12(b)(1). The district court determined that it was bound by *Ayala v. United States*, 550 F.2d 1196 (9th Cir.1977), *cert. granted*, 434 U.S. 814, 98 S.Ct. 50, 54 L.Ed.2d 70 (1977), *cert. dismissed*, 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978), which it characterized as holding pendent-party jurisdiction unconstitutional.

### DISCUSSION

We note at the outset that the district court dismissed this case on the pleadings. Consequently, our review is de novo, and we may affirm the dismissal "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spald-*

---

**2.** The complaint also alleged a mail fraud RICO predicate in sending forms falsely verifying employment eligibility to the government. In a ruling that has not been appealed, the district court held that the mail fraud scheme did not provide an adequate RICO predicate act because the employees were not the party defrauded.

**3.** The district court "remanded" the remaining state law claims against the growers. As the parties acknowledge, dismissal, not remand, was called for because this suit was originally brought in federal court. *See* 28 U.S.C. § 1447.

*ing,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In the RICO context, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *NOW v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

■ The district court offered two bases for dismissal on the pleadings: RICO standing and supplemental jurisdiction. We discuss those issues below, but first we address one proffered alternative ground for affirming the dismissal for failure to state a claim, an argument that need not detain us long. RICO prohibits engaging in a pattern of "racketeering activity," defined as violating certain laws; as such, a predicate illegal act must be alleged. 18 U.S.C. §§ 1962(c), 1961(1)(F). The district court held that the "Illegal Immigrant Hiring Scheme" as pleaded involved a predicate RICO act, knowingly hiring undocumented workers in violation of Immigration and Naturalization Act § 274, 8 U.S.C. § 1324. We are unpersuaded by the growers' argument that the district court erred in this respect. Their argument rests on a hypertechnical reading of the complaint inconsistent with the generous notice pleading standard. *See Swierkiewicz,* 122 S.Ct. at 999. The complaint alleges that the defendants had knowledge of illegal harboring "and/or" smuggling.

Even if knowledge of smuggling were required by the statute, an issue about which we express no opinion, the complaint easily contains this allegation. We affirm the district court's analysis and reasoning on this issue, and turn to standing and supplemental jurisdiction.

## I. STANDING

### A. STATUTORY STANDING

■ We turn first to the statutory standing requirements particular to RICO. Under RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court" for civil damages. 18 U.S.C. § 1964(c). This statute is quite similar to the antitrust statute granting standing to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a), and consequently the two have been interpreted in tandem. *Holmes v. Sec. Inv. Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The employees allege an injury to their property in the form of lost wages.[4] The key task is to determine whether this injury was "by reason of" the growers' alleged violations, a requirement the Supreme Court has interpreted to encompass proximate as well as factual causation.

In a series of cases beginning in the antitrust context and later extended to RICO, the Supreme Court clarified that potential plaintiffs who have suffered

---

4. The growers suggest that the employees would have to show a "property right" in the lost wages, by showing that they were promised or contracted for higher wages. This argument is misplaced in the context of RICO. This case does not implicate procedural due process; rather, what is required is precisely what the employees allege here: a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes. 18 U.S.C. §§ 1962(c), 1961(1); *Dumas v. Major League Baseball Prop.,* 104 F.Supp.2d 1220, 1222 (S.D.Cal. 2000), *aff'd sub nom. Chaset v. Fleer/Skybox Int'l, LP,* 300 F.3d 1083, 1087 (9th Cir.2002) (holding no "injury to property" under RICO).

"passed-on" injury—that is, injury derived from a third party's direct injury—lack statutory standing. *Ill. Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Assoc. Gen'l Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Holmes,* 503 U.S. at 268. *Illinois Brick* held that government consumers could not sue on a theory that high prices were passed on to them as a result of the defendants' illegal price-fixing scheme. 431 U.S. at 736. Similarly, in *Associated General Contractors,* unions lacked standing to sue a contractors' association for an illegal conspiracy to use nonunion subcontractors because such a conspiracy would directly victimize the union subcontractors, not the unions. 459 U.S. at 520–21. *Holmes* extended the requirement to RICO; nonpurchasing customers, forced to cover costs when brokers became insolvent as a result of an illegal stock manipulation scheme, could not sue for this derivative harm. 503 U.S. at 268.

■ In this circuit, we focus on three nonexhaustive factors in considering causation, that is whether the injury is "too remote" to allow recovery:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.,* 241 F.3d 696, 701 (9th Cir.) (quoting *Oregon Laborers—Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957, 963 (9th Cir. 1999)), *cert. denied,* —— U.S. ——, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001)

("*Wash.Pub.Hosp.*"). At this stage of the proceedings, we cannot say that there is "no set of facts that could be proved," to satisfy these requirements. *Swierkiewicz,* 122 S.Ct. at 998.

Our analysis is guided by two key cases, both decided after the district court's original opinion. *See Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir.2000); *Commercial Cleaning Servs. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 378 (2d Cir.2001).

The relationships among the parties in this case bear a striking resemblance to those in *Knevelbaard Dairies,* an antitrust case in which we recently held that the plaintiffs had standing. There, milk producers sued defendant cheese producers, who illegally fixed the price of cheese, which in turn set the price of milk artificially low. 232 F.3d at 989. Applying classic antitrust standing principles, we looked "to the chain of causation between [plaintiff's] injury and the alleged restraint in the market." *Id.* at 989 (quoting *Am. Ad Mgmt. Inc. v. General Tel. Co.,* 190 F.3d 1051, 1058 (9th Cir.1999)). We concluded that the milk producers' injury was sufficiently direct. Their allegations that they would "receive[ ] less for milk than they otherwise would have received in the absence of the defendants' unlawful conduct" were "disputed claims of causation and injury [that] cannot be decided on a Rule 12(b)(6) motion." *Id.* at 989. The employees here, like the milk producers in *Knevelbaard Dairies,* claim a direct market injury as a result of the alleged illegal hiring scheme (or in the case of *Knevelbaard Dairies,* as a result of the price fixing in the cheese market). In fact, the causation allegations here are more direct than *Knevelbaard Dairies,* as the employees allege a direct impact on the labor market, not the more attenuated claim of

an impact on the cheese market, which in turn affected the milk prices.

The Second Circuit, the only circuit to have considered allegations of illegal immigrant hiring based on the same predicate act as that at issue here, held that the plaintiffs had standing to sue under RICO. In *Commercial Cleaning*, a competitor alleged that the defendant janitorial service underbid it by relying on laborers that the defendant knew to be undocumented. 271 F.3d at 378. The injury was not derivative of an injury to a third party because "the theory of Commercial's claim is that Colin undertook the illegal immigrant hiring scheme in order to undercut its business rivals." *Id.* at 384. Similarly here, the employees allege that the illegal hiring scheme was divined in order to depress the normal labor market.

■ Turning to the first factor, taking the allegations in the complaint as true, we are unable to discern a more direct victim of the illegal conduct. The documented employees here do not complain of a passed-on harm. They allege that the scheme had the purpose and direct result of depressing the wages paid to them by the growers. Thus, as the district court correctly determined, "plaintiffs have stated a claim that they are the direct victims of the illegal hiring scheme."

As in *Knevelbaard Dairies* and *Commercial Cleaning*, the scheme aims to gain an illegal commercial advantage—here, disproportionate bargaining power in employment contracts—in the growers' dealings with the employees. Neither the government nor the undocumented workers are an intervening third party in this scheme, despite the growers' arguments to the contrary. The claims here thus differ fundamentally from passed-on injury cases. *See Imagineering Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1312 (9th Cir. 1992) (holding that minority- and women-owned subcontractors could not sue gener-

al contractors under RICO for an illegal scheme to evade federally required quotas because the direct harm was to competitor general contractors who complied with the quotas); *Oregon Laborers*, 185 F.3d at 963–67 (holding that health care trust funds could not sue tobacco companies under RICO because their injury derived from the smokers' injury); *Wash. Pub. Hosp.*, 241 F.3d at 703 (same for health care providers). In contrast to these other cases, the alleged scheme here was intended to give the growers a contract advantage at the expense of the documented workers, a direct rather than a pass-through injury.

We also note that the undocumented workers cannot "be counted on to bring suit for the law's vindication." *Holmes*, 503 U.S. at 273; *cf. Hoffman Plastic Compounds Inc. v. NLRB*, —— U.S. ——, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) (holding that undocumented workers are not entitled to backpay wrongfully withheld in a labor dispute). Although not dispositive, *see Oregon Laborers*, 185 F.3d 957, we heed the Supreme Court's example and consider this factor in our analysis. As the district court noted, the fact that RICO specifically provides that illegal hiring is a predicate offense indicates that Congress contemplated the enforcement of the immigration laws through lawsuits like this one. 18 U.S.C. § 1961(1)(F).

■ The second concern to which we direct our attention is the speculative measure of harm. The district court noted that "intervening factors ... could have interfered with the plaintiffs receiving higher pay absent the defendants' hiring of undocumented workers. These intervening factors include the wage paid by other orchards in the area, the skill and qualifications of each plaintiff, the profitability of the defendants' businesses without the undocumented workers, and the general

availability of documented workers in the area." In other words, the district court dismissed the complaint based on the conclusion that factors other than the scheme coupled with the growers' power in the relevant labor market *could* account for the plaintiffs' depressed wages. The difficulty with this reasoning is that the employees allege that the growers singularly have the ability to define wages in this labor market, akin to monopsony or oligopsony power. *See* Phillip Areeda, et al., *Antitrust Law* ¶¶ 574, 1431 (1995). They further allege that it is the illegal scheme that has caused their injury. The proposed amended complaint lays to rest any remaining doubt about attributing the alleged harm to the scheme, by spelling out a broad conspiracy causing direct harm to the workers. For example, it makes clear that the scheme involves fruit growers that "comprise a large percentage of the fruit orchards and packing houses in the area, and therefore affect wages throughout the labor market."

The district court's analysis focused primarily on cause-in-fact, not proximate cause, and it is inappropriate at this stage to substitute speculation for the complaint's allegations of causation. As we explained in *Knevelbaard Dairies* when we rejected the claim that milk prices might have been lower due to independent factors instead of the cheese price fixing: "Whether experts will be able to measure the difference between the allegedly restrained price for milk and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative." 232 F.3d at 991.

Similarly here, the workers must be allowed to make their case through presentation of evidence, including experts who will testify about the labor market, the geographic market, and the effects of the illegal scheme. Questions regarding the relevant labor market and the growers' power within that market are exceedingly complex and best addressed by economic experts and other evidence at a later stage in the proceedings. For now, it is sufficient that the employees have alleged market power—they must not be put to the test to prove this allegation at the pleading stage. *See Scheidler,* 510 U.S. at 256; *In re Warfarin Sodium Antitrust Litigation,* 214 F.3d 395, 398 (3d Cir.2000) (reversing dismissal based on lack of antitrust standing because "the District Court considered facts gleaned from counsel's argument and from its own experience, factors not contemplated by the dictates of · Rule 12(b)(6)").

Finally, it is important to distinguish between uncertainty in the fact of damage and in the amount of damage. *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 811 (9th Cir.1976) ("Different standards govern proof of the fact and proof of the amount of damages."). That wages would be lower if, as alleged, the growers relied on a workforce consisting largely of undocumented workers, is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing how much lower the wages would be. *Cf. Oregon Laborers,* 185 F.3d at 964 (holding medical costs resulting from injury to smokers easily established).

■ Turning to the final factor, the growers do not appear to argue that there is a significant risk of multiple recovery in this case. No other potential plaintiffs emerge with clarity. Also, as the Second Circuit reasoned, even if there are other classes of potential plaintiffs who could recover for the alleged illegal hiring scheme, such lawsuits would not threaten multiple recovery of passed-on harm. *Commercial Cleaning,* 271 F.3d at 383–84.

This factor does not bar suit for "different classes of plaintiffs, each of which suffered a different concrete injury, proximately caused by the violation." *Id.* at 384. In sum, there is no difficulty avoiding multiple recovery here because this is not a suit for derivative or passed-on harm.

### B. CONSTITUTIONAL STANDING

 Because they are invoking federal jurisdiction, the employees must establish "the irreducible constitutional minimum of standing" in addition to meeting the statutory standing requirements. *Lujan*, 504 U.S at 560–61. This minimum or threshold consists of three factors: (1) injury in fact: "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *id.* at 560 (citations and internal quotations omitted); (2) causation: the injury must be fairly traceable to the defendant's challenged action, *id.;* and (3) redressability: "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision," *id.* at 561 (internal quotations omitted).

 Based on the complaint, the employees easily meet this test. First, they allege a concrete, actual injury in their lost wages. As discussed above, their causation allegations are sufficient at this stage. *See Scheidler,* 510 U.S. at 256 (rejecting a constitutional causation challenge in a RICO suit where the plaintiffs alleged that a conspiracy to threaten staff and patients "has injured the business and/or property interests of the [petitioners]"). Finally, because the award of money damages will redress the injury of lost wages, the third element is also met.

### II. SUPPLEMENTAL PARTY JURISDICTION

The employees sued Selective Employment solely under state law, precluding federal question jurisdiction, and all parties are Washington citizens, precluding diversity jurisdiction. *See* 28 U.S.C. §§ 1331 & 1332. In such a situation, absent an independent basis for federal subject matter jurisdiction, Congress has authorized the district court to exercise supplemental jurisdiction:

> [T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1337(a).[5]

Prior to the passage of § 1337, supplemental jurisdiction was more circumscribed and the addition of a party was one factor that barred jurisdiction over additional claims brought by plaintiffs. *See generally* Denis F. McLaughlin, *The Federal Supplemental Jurisdictional Statute—A Constitutional and Statutory Analysis,* 24 Ariz. St. L.J. 849, 859–89 (1992). In 1973, the Supreme Court expressed some skepticism about "pendent party jurisdiction"—jurisdiction over plaintiffs' claims requiring the addition of parties not involved in the main lawsuit. The Court characterized this issue as a "subtle and complex question with far-reaching implications." *Moor v. County of Alameda,* 411 U.S. 693, 715, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). Continuing this thread, in *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the

---

**5.** The statute restricts supplemental jurisdiction in certain cases where the underlying basis for federal jurisdiction is diversity. 28 U.S.C. § 1337(b). This provision is not at issue in this case, which rests on federal question jurisdiction.

Court held that pendent party jurisdiction was impermissible as a matter of statutory construction under the particular circumstances of the case. Finally, in *Finley v. United States*, 490 U.S. 545, 549, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the Court "assume[d], without deciding," that pendent party jurisdiction was constitutional, but cautioned that it requires an express statutory jurisdictional grant. In 1990, Congress enacted § 1367 to provide such an express grant. Pub.L. No. 101–650 § 310.

The statutory grant of jurisdiction is, of course, limited by constitutional boundaries. Upon careful review, however, we are convinced that the controlling constitutional standard remains that articulated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966): The claims must form "but one constitutional 'case'" and "derive from a common nucleus of operative fact." We therefore decline Selective Employment's invitation to impose a per se constitutional bar on supplemental jurisdiction over claims against additional parties.

### A. *AYALA V. UNITED STATES*

Selective Employment relies on *Ayala v. United States*, 550 F.2d 1196, 1199–1200 (9th Cir.1977), where we held that federal courts were without power to exercise pendent party jurisdiction under the Federal Tort Claims Act. At that time, neither of the key Supreme Court cases, *Moor* and *Aldinger*, had resolved the question, nor did we have the benefit of the explicit language of *Finley*, which came ten years later. Selective Employment, however, points to language that implied that, in addition to not being authorized under any statute, pendent party jurisdiction posed constitutional difficulties. *Id.* at 1199, 1200 n. 8. These statements, however, are best read as flagging the necessity for caution due to potential constitutional problems that might arise with an unduly broad exercise of pendent jurisdiction.

Significantly, *Ayala* also came before intervening decisions that clarified that *Ayala*'s restrictive interpretation does not survive the 1990 passage of § 1367. We explained in *Galt G/S v. Hapag–Lloyd AG*, 60 F.3d 1370, 1374 (9th Cir.1995), that *Finley* imposed two requirements for supplemental jurisdiction: (1) the claims must be "part of the same constitutional 'case'"; and (2) the jurisdiction must be expressly authorized by statute. We further observed that "28 U.S.C. § 1367 supercedes this second *Finley* requirement...." *Id.* at 1374 n. 3; *see also Yanez v. United States*, 989 F.2d 323, 327 n. 3 (9th Cir. 1993) (holding that court lacked jurisdiction in pre–1990 suit, but noting that "Congress has now explicitly authorized pendent party jurisdiction" (citing 28 U.S.C. § 1367)).

### B. CONSTITUTIONALITY OF SUPPLEMENTAL JURISDICTION UNDER § 1367

Any lingering doubt that *Ayala* establishes a binding constitutional rule is put to rest by the Supreme Court's recent decision in *Raygor v. Regents of the University of Minnesota*, 534 U.S. 533, 122 S.Ct. 999, 1004, 152 L.Ed.2d 27 (2002). Holding that a tolling provision was curtailed by the Eleventh Amendment, the Court discussed the history of supplemental jurisdiction:

> In *Mine Workers v. Gibbs*, this Court held that federal courts deciding claims within their federal-question subject matter jurisdiction, 28 U.S.C. § 1331, may decide state law claims not within their subject matter jurisdiction if the federal and state law claims "derive from a common nucleus of operative fact" and comprise "but one constitutional 'case.'" ... This Court later made

clear that *absent authorization from Congress*, a district court could not exercise pendent jurisdiction over claims involving parties who were not already parties to a claim independently within the court's subject matter jurisdiction. *See Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989).

122 S.Ct. at 1004 (emphasis added; some citations omitted). The Court elaborated that § 1367 provided just such authorization, functioning as a "general grant of jurisdiction." *Id.* at 1005. As the Supreme Court explained in *Raygor*, Article III permits supplemental jurisdiction "if the federal and state law claims 'derive from a common nucleus of operative fact' and comprise 'but one constitutional case.'" *Id.* at 1004(quoting *Gibbs*, 383 U.S. at 725) (some internal quotation marks omitted). Thus, any suggestion in *Ayala* that the Constitution imposes a bar on supplemental jurisdiction over additional parties independent of statutory authorization has been undermined by intervening Supreme Court authority. *See United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992) (holding that a prior panel decision is not binding in such a situation).

Selective Employment provides no compelling rationale to restrict supplemental jurisdiction beyond the limitation imposed in *Gibbs*. Indeed, the district court suggested that it would hold otherwise but for the belief that its hands were tied by *Ayala*. The district court's instincts were vindicated by the Supreme Court's later ruling in *Raygor*. We acknowledge, of course, that federal courts are courts of limited jurisdiction. U.S. Const. Art. III, sec. 2; *Finley*, 490 U.S. at 550(quoting *Aldinger*, 427 U.S. at 15). The *Gibbs* standard defines the minimum constitutional constraints, offering both Congress and the district courts flexibility to shape each case in a way that is efficient for the

courts, fair to the parties, and respectful of state sovereignty.

Finally, we note that none of our sister circuits has imposed a per se constitutional restriction on supplemental jurisdiction over additional parties. *See Hinson v. Norwest Financial S.C., Inc.*, 239 F.3d 611, 615 (4th Cir.2001) (holding that district court did not abuse its discretion in joining plaintiffs who asserted only state law claims); *HB Gen'l Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1197–98 (3d Cir.1996) (holding that nondiverse party could be joined for counterclaims); *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.1995) (noting that only *Gibbs* now limits its pendent party jurisdiction); *Palmer v. Hosp. Auth.*, 22 F.3d 1559, 1566–67 (11th Cir.1994) (holding that district court had pendent party jurisdiction because claims involved the "same facts, occurrences, witnesses, and evidence").

 Thus, to avoid dismissal for lack of federal subject matter jurisdiction, the employees must show that the state conspiracy claims against Selective Employment constitute part of the same constitutional case as the federal RICO claims against the growers. Assuming that the claims meet the *Gibbs* standard, the district court has the power to exercise supplemental jurisdiction. The decision to exercise that jurisdiction remains discretionary with the district court. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (holding that district courts may decline to exercise jurisdiction over supplemental state law claims in the interest of judicial economy, convenience, fairness, and comity). We therefore remand for the district court to determine, in the first instance, whether the application of the *Gibbs* standard permits the exercise of supplemental jurisdiction, and to exercise discretion over whether such

jurisdiction would be appropriate in the context of this litigation.

REVERSED and REMANDED.