INFORMATION RESOURCES,
INC., Plaintiff,

v.

THE DUN & BRADSTREET CORP.,
A.C. Nielsen Co., and IMS International, Inc., Defendants.

No. 96 Civ. 5716(LLS).

United States District Court,
S.D. New York.

July 12, 2000.

Order Clarifying Opinion
February 6, 2001.

412

Freeborn & Peters, Chicago, IL, Brian P. Norton, of counsel, Fried Frank Harris Shriver & Jacobson, New York City, Victor S. Friedman, of counsel, Boies, Schiller & Flexner, L.L.P., Armonk, NY, Robert Silver, of counsel, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Leslie Gordon Fagen, Sidney S. Rosdeitcher, Aidan Synnott, Daniel A. Crane, of counsel, for defendants.

### Opinion and Order

STANTON, District Judge.

I. Background

Plaintiff Information Resources, Inc. ("IRI") is a Delaware corporation headquartered in Chicago. It provides retail tracking services to manufacturers who sell consumer goods in the United States. Retail tracking services:

> ... involve the continuous collection of data on the sale of consumer packaged goods. From this data, retail tracking services suppliers produce estimates of trends in sales of product categories and brands, by relevant geographic region for each product category being tracked.

> In short, a retail tracking service is the provision of information to manufacturers and retailers of consumer goods concerning turnover, market share, pricing and other aspects of the sale of fast moving consumer goods and analysis of that information to reveal market trends, business conditions, and the like.

Def.'s 56.1 Statement ¶¶ 2–3.

Additionally, IRI participates in offering retail tracking services through its subsidiaries and joint ventures in France (where it owns an 89% interest in a corporation formed pursuant to a joint venture agreement), Germany (where it owns a 51% interest in a corporation formed pursuant to a joint venture agreement), Great Britain (where it owns an 87% interest in a corporation formed pursuant to a joint venture agreement), Italy (where two holding companies wholly owned by IRI operate a subsidiary), the Netherlands (where it owns a 51% interest in a company formed pursuant to a joint venture agreement), and Sweden (where it owns an 8% interest in a corporation formed pursuant to a joint venture agreement).

IRI either has "strategic partnerships" or "relationships" with companies offering retail tracking services in a variety of other nations in which it claims antitrust injury, but has no ownership interest in the foreign concerns, despite some attempts to purchase a company already doing business in the foreign market in order to provide retail tracking services in that market. IRI has made plans to enter additional markets.

In those six nations in which IRI participates through a joint venture or a subsidiary, it is the subsidiary or joint venture which enters into agreements with the clients for provision of services (Pl.'s Rule 56.1 Statement ¶ 27) and negotiates for the acquisition of local data (*id.* ¶ 28). The subsidiary or joint venture obtains the scanning data directly from the clients. *Id.* ¶ 29. Raw data is then loaded onto computers in the offices of the subsidiaries or joint ventures. *Id.* at ¶ 31. That data is then transmitted to IRI in the United States, where it is "normalized" (*id.* ¶ 33), put onto IRI's computers (*id.* ¶ 33), and processed (*id.* ¶ 40). The processed data is generally then sent directly back to the subsidiary or joint venture. *Id.* ¶ 45. The subsidiary or joint venture then delivers the customer report directly to the client. *Id.* ¶ 50.

Defendant A.C. Nielsen Company ("Nielsen") is an operating unit of defendant Dun & Bradstreet, offering retail tracking services in the United States, and in at least 80 foreign countries.

IRI contends in this lawsuit that Nielsen engaged in anticompetitive activity by applying "favorable pricing conditions if Nielsen's services were purchased in a considerable number of countries, including, at least, one country where IRI was present." Pl.'s Mem. at 5. For purposes of this motion, Nielsen does not contest this allegation.

In this motion for partial summary judgment, defendants argue that (1) IRI lacks standing to sue for injuries suffered in foreign markets, because the injury was actually suffered by its subsidiaries and joint ventures; and (2) this court lacks jurisdiction under the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a (1997) ("FTAIA"), to hear such claims in any event, because the foreign activities of which IRI complains are beyond the reach of United States antitrust laws.

## II. Standing

" 'Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute "antitrust injury" sufficient to confer antitrust standing.' " *G .K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1995), quoting *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1378 (7th Cir.1987).

IRI argues that although nominally independent, its subsidiaries and joint ventures operate with IRI to provide a unitary service which could not be performed without IRI's role. Further, IRI contends that the injury it suffers in the form of diminished demand for its services is cognizable under United States antitrust laws because it is directly and intentionally caused by defendants' anticompetitive activities.

In *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 908–10, 74 L.Ed.2d 723 (1983), the Supreme Court weighed "factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Id.* 103 S.Ct. at 908. It considered the nature of the plaintiff's alleged injury and its relationship to the antitrust violation, whether the injury is of a type which Congress sought to redress in the antitrust laws, whether the injury is direct or indirect, whether there is " . . . an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement..." thereby diminishing the justification of suit by a more remote plaintiff, the degree of speculation or complex apportionment involved in the claim for damages, and the potential for multiple liability of the defendant should another plaintiff bring suit. The Court concluded (103 S.Ct. at 912):

> We conclude, therefore, that the Union's allegations of consequential harm resulting from a violation of the anti-

trust laws, although buttressed by an allegation of intent to harm the Union, are insufficient as a matter of law. Other relevant factors—the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement of the Union's antitrust claim.

A similar analysis of this case follows.

1. Consequential Harm and Intent to Injure

For purposes of this motion, defendants concede a causal connection between the alleged antitrust violation and the harm to the plaintiff, as well as their intent to injure IRI. Def.'s Mem. at 12.

2. Directness of Injury

■ IRI contends that it is a competitor of defendants in the foreign markets, while defendants argue that the foreign subsidiaries and joint ventures of IRI, not IRI itself, are the competitors.

Defendants have the better of the argument. IRI is the supplier of data services to its joint ventures and subsidiaries, who are the direct participants in the foreign markets. They find the foreign clients, obtain the data from these clients, and deliver the completed reports to them. Unlike the plaintiff farmers in *Amarel v. Connell*, 102 F.3d 1494 (9th Cir.1996) who participated directly in the injured mills' profits, IRI does not participate directly in the profits of the foreign companies. Those companies pay IRI for its data processing services pursuant to contracts, and IRI is one of the joint venturers by whom the companies are owned, but neither of those facts makes IRI a direct participant in the market of foreign retail tracking services.

In *G.K.A. Beverage*, the court held that terminated soft-drink distributors did not have standing to sue those who conspired to monopolize the bottling industry and bankrupted their bottler (55 F.3d 762, 766–67):

We believe that the distributors do not have standing to bring an antitrust claim against defendants because the distributors have not alleged an antitrust injury ... It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing ...

Although the distributors undoubtedly suffered injury as a result of the alleged antitrust violation, the injury suffered by the distributors is derivative of the injury suffered by Seven Up Brooklyn [the bottler].

Here, too, IRI's injury, while real, is derivative of the injury suffered by its foreign joint ventures and subsidiaries.

IRI's supplies of processing services and finished data reports to its foreign affiliates do not give it antitrust standing. 2 AREEDA & HOVENKAMP, ANTITRUST LAW § 375(d) at 302 (1995); *see also, Crimpers Promotions, Inc. v. Home Box Office*, 724 F.2d 290, 294 (2d Cir.1983) (distinguishing "a 'supplier' of a competitor, to whom standing is generally denied.").

*Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) is of no help to IRI. McCready's injury was direct, for she was the person to whom reimbursement of her psychologist's bills was refused, by the antitrust conspirator, as part of its boycott of psychologists.

3. Identifiable Class of Self-Interested Parties

■ The subsidiaries and joint ventures are an "identifiable class of persons whose self-interest would normally motivate them

to vindicate the public interest in antitrust enforcement. . ." This diminishes the justification for suit by IRI, a more remote party. Injuries sustained by the subsidiaries and joint ventures are direct and, as stated in *Associated General,* 103 S.Ct. at 910–11:

> . . . they would have a right to maintain their own treble-damages actions against the defendants. An action on their behalf would encounter none of the conceptual difficulties that encumber the Union's claim. The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied.

In fact, there is some evidence in the briefs that the foreign affiliates are considering such a suit. Def.'s Mem. at 13, fn. 8.

### 4. Uncertain or Speculative Damages

Although neither party addresses this point in detail in its briefs, the defendants claim "[a]ny damages flowing to IRI are speculative because they require measurement first of the impact on its foreign affiliates and second the derivative impact on IRI." Def.'s Mem. at 13. It would probably be feasible, however, to calculate IRI's damages with the relaxed degree of precision required for computations of lost revenues in antitrust cases, and this factor is of little weight.

### 5. Multiple Recoveries

IRI's subsidiaries and joint ventures abroad suffer the primary injury from defendants' activities. If they sue on their own behalf, allowing IRI to recover on its derivative claims could result in double recoveries (each to be trebled) against the defendants.

\*     \*     \*     \*     \*     \*

█ From the submissions, there seems little doubt that inflicting competitive injury on IRI was a goal and purpose of defendants' alleged activities, and that the economic connection between the alleged violations and the effect on IRI is linear and short; nevertheless the fact that the primary injury fell on the foreign companies (who have rights to sue for whatever remedies the law applicable to them provides), together with the factors discussed above, leaves IRI without standing to sue for its derivative injuries.

The foregoing discussion disposes of the issues raised by the motion, and renders it unnecessary to address defendants' alternative ground for dismissal: that this court lacks jurisdiction under the FTAIA. If the foreign subsidiary and joint venture corporations sue, the question of United States jurisdiction may arise; until then, its determination would be advisory.

### Conclusion

Defendants' motion for partial summary judgment is granted. IRI's claims of injury suffered from defendants' activities in foreign markets where IRI operates through subsidiaries or companies owned by joint ventures, or "relationships" with local companies, are dismissed.

So ordered.

### Memorandum and Opinion

With respect to the points raised in the parties' submissions in connection with plaintiff's Motion to Clarify the Court's July 12, 2000 Order and for Leave to Amend its Complaint:

#### A. *Motion to Clarify*

1. The July 12, 2000 Order adjudicated only that (as stated in its conclusion):

> IRI's claims of injury suffered from defendant's activities in foreign markets where IRI operates through subsidiaries

or companies owned by joint ventures, or "relationships" with local companies, are dismissed.

(Order, p. 9).

That ruling accepted the chief ground of defendants' motion for partial summary judgment: as defendants expressed it, that IRI lacks standing to sue

> because it was not the person directly affected by the alleged conduct. Rather, the conduct allegedly harmed IRI's affiliates in Europe—separate corporate entities that are not parties to this suit. IRI was affected only in its capacity as a shareholder of, and supplier to, the European entities. It is hornbook law that the shareholder and supplier relationships are insufficient to confer standing.

(Defendants' December 22, 1999 Brief in Support of Their Motion, p .1).

IRI so understood the thrust of defendants' motion. IRI articulated defendant's claim as being

> that in these markets, "[t]he competition is between A.C. Nielson and IRI's Affiliates," because these affiliates, not IRI, "provide" and sell the retail tracking services. According to Defendants, IRI is a "mere supplier" to and "investor" in such entities and, as a consequence, lacks standing.

(Plaintiff's February 17, 2000 Response, p. 11) (citations omitted).

The court's adoption of defendants' view of the applicable law led to the conclusion that IRI cannot recover for losses it sustained indirectly from antitrust injuries inflicted directly on intermediary entities abroad.

■ 2. Not only where IRI shared in the subsidiary's losses as a partner, joint venture or shareholder, but also where its volume of sales to the subsidiary was diminished because of the subsidiary's loss of business, IRI has no standing to sue, because (together with the other factors stated in the Order) IRI's injury is derivative of the antitrust injury inflicted on the subsidiary. Nor can IRI recover damages for weakening of its competitive position in the United States because of reduced revenue from its foreign subsidiaries. The deprivation of revenue, and the consequent inability to use the lost money to competitive advantage, amount to the same thing. The only value of money lies in the uses to which it can be put.

■ 3. But where IRI proves that a foreign or domestic direct customer shunned IRI's retail tracking services (*e.g.* by refusing access to raw sales data, or refusing to use IRI's services) because of an agreement it had made with defendants in violation of the Sherman Act, and there is no intermediary affiliated company, IRI has standing to sue for its lost profits. On principles familiar at least since *U.S. v. Aluminum Co. of America*, 148 F.2d 416 (2nd Cir.1945), in light of the allegations that the anticompetitive agreements reflected a course of dealing conceived in the United States which was intended to and did affect domestic commerce, the court has jurisdiction to hear that claim.

4. The materials submitted on the partial summary judgment motion gave no sufficient basis for ruling on the extent to which IRI can recover for lost revenues in particular foreign or domestic markets it prepared to or attempted to enter itself, but from which it claims it was excluded. Defendants concede that the "standing" argument does not apply to markets IRI "sought to enter... directly, rather than through an affiliated company." (Defendant's December 22, 1999 Brief In Support of Their Motion, p. 17, n. 11). Such claims were not excluded by the Order. It is unclear whether they are too speculative.

B. *Motion for Leave to Amend the Complaint*

1. *To Join and Substitute IRI's Subsidiaries as Plaintiffs on its Sherman Act Claims*

■ The analysis starts with the fact that each of the foreign markets is a sepa-

rate market. As stated in the proposed Second Amended Complaint ¶ 26:

> Because of differences in consumer demand, language, currency, custom, brand names, product bar codes and advertising, among others, retail tracking services are national in coverage. For example, a manufacturer could not use a retail tracking service based on German sales data to track French sales or a service based on Italian sales data to track sales in the United States.

Thus, by definition each subsidiary competed only in its own national market where it sustained its own claimed injury. That injury also had an effect in the United States: IRI, as a shareholder and supplier of the subsidiary, lost revenues from the subsidiary. IRI is defendants' only competitor in the United States, and there is no claim of any other material effect upon domestic trade or commerce from the subsidiary's injury than the effect upon IRI.

Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, for the Sherman Act to apply to the defendants' alleged foreign conduct against the subsidiaries, the effect of that conduct on domestic trade or commerce must be "direct, substantial and reasonably foreseeable", *id.* at § 6a(1), and must give rise to a claim under the Sherman Act. *Id.* at § 6a(2).

But, as already adjudicated in the Order, the effect of the foreign conduct on IRI was not direct. It was indirect and derivative, and did not give rise to a claim under the Sherman Act. In short, although the defendants' conduct which caused the subsidiaries' claims had an effect in the United States, that effect was indirect, derivative and did not give rise to a Sherman Act claim.

Thus, under the FTAIA, the subsidiaries have no Sherman Act claims, and leave to join them to this action to assert such claims is denied. *Cf. In re Copper Antitrust Litigation,* 117 F.Supp.2d 875, 887

(W.D.Wis.2000) ("It is not reasonable to think that Congress wanted to provide a forum for mostly foreign plaintiffs who were injured abroad by effects felt abroad and not in American markets, even if the wrongdoer's conduct produced other anticompetitive effects in the United States.")

## 2. *To Assert Claims Under Article 82 of the Treaty of Rome*

■ A district court may decline to exercise supplemental jurisdiction over otherwise cognizable claims which raise novel or complex issues of State law, even if they are so related to claims in the action that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(c)(1). Passing the point that the "State" involved is the European Economic Community, the United Kingdom, France, Germany, Italy, the Netherlands or Spain (or all of them), the novel and complex issues presented by Article 82 of the Treaty of Rome (to which the United States is not a party) counsel against exercising supplemental jurisdiction over its application to the subsidiaries' claims.

Normally the subsidiary's claims under Article 82 of the Treaty of Rome would be brought in its national court, which would apply its own substantive and procedural rules and remedies in giving effect to the Treaty, and would have the option of seeking an opinion from the European Court of Justice on questions of European Community law. This court does not have that option; it would have to decide what European Community law would be, *de novo.* European countries' laws are neither uniform nor individually fully developed with respect to issues arising under the Treaty (*e.g.* statutes of limitation, degree of injunctive relief, awards of attorney's fees and expenses), and expert testimony might be required concerning the law of each jurisdiction. (November 10, 2000 Declaration of Dr. John Temple Lang, Esq., pp. 6–7).

Although Article 82 of Treaty of Rome is "roughly analogous" to the Sherman Act, *Capital Currency Exch. v. Nat'l Westmin-*

*ster Bank*, 155 F.3d 603, 610 (2nd Cir. 1998), its application to the subsidiaries' claims in six separate European markets would present sufficiently novel and complex issues of foreign law to persuade this court to decline to exercise supplemental jurisdiction, even if the Article 82 claims are otherwise cognizable.

### CONCLUSION

The July 12, 2000 Order is clarified and explicated as set forth above. The application for leave to amend the complaint to add the subsidiaries as parties is denied.

So ordered.