**INFORMATION RESOURCES, INC., Plaintiff,**

v.

**THE DUN & BRADSTREET CORPORATION, A.C. Nielsen Co. and IMS International, Inc., Defendants.**

**No. 96 Civ. 5716(LLS).**

United States District Court, S.D. New York.

April 28, 2003.

Freeborn & Peters, Chicago, IL (Brian P. Norton, Michael J. Kelly, Jennifer L. Fitzgerald, Michael P. Kornak, of counsel), Fried Frank Harris Shriver & Jacobson, New York City (Victor S. Friedman, of counsel), Boies, Schiller & Flexner, Armonk, NY (David Boies, Sherab Posel, of counsel), for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Sidney S. Rosdeitcher, Leslie Gordon Fagen, Aidan Synnott, Daniel A. Crane, Matthew J. Kalmanson, of counsel), for defendant.

### OPINION and ORDER

STANTON, District Judge.

The Court of Appeals, in its opinion reported at 294 F.3d 447, 448–9, concisely describes this lawsuit:

> IRI and Nielsen are both providers of retail tracking services. These services, as described by the district court,
>
>> involve the continuous collection of data on the sale of consumer packaged goods. From this data, retail tracking services suppliers produce estimates of trends in sales of product categories and brands, by relevant geographic region for each product category being tracked.
>>
>> In short, a retail tracking service is the provision of information to manufacturers and retailers of consumer goods concerning turnover, market share, pricing and other aspects of the

sale of fast moving consumer goods and analysis of that information to reveal market trends, business conditions, and the like.

Both Nielsen and IRI provide these services in the United States. While Nielsen also offers these services in several foreign countries, IRI generally operates abroad through an assortment of subsidiaries and joint ventures. These foreign affiliates "find the foreign clients, obtain the data from these clients, and deliver the completed reports to them." The data are processed and the resulting reports are generated by IRI in the United States.

In this action, IRI alleges that Nielsen engaged in a variety of anticompetitive conduct, both in the United States and abroad, with the purpose of destroying IRI as competition in the retail tracking services industry. The alleged antitrust violations include tying and bundling contracts in violation of Section 1 of the Sherman Act, monopolization and attempted monopolization of the export (that is, foreign) markets in violation of Section 2 of the Sherman Act, and attempted monopolization of the United States market in violation of Section 2 of the Sherman Act. Among the principal allegations is that Nielsen would offer "favorable pricing conditions if Nielsen's services were purchased in a considerable number of countries, including, at least, one country where IRI was present." (citations omitted)

*Background*

In an Opinion dated July 12, 2000, clarified by Memorandum dated February 6, 2001, both reported at *Information Resources, Inc. v. Dun & Bradstreet Corp., et al.,* 127 F.Supp.2d 411 (S.D.N.Y.2000), *appeal dismissed,* 294 F.3d 447 (2d Cir.2002), this court decided, among other things, that (127 F.Supp.2d at 415):

From the submissions, there seems little doubt that inflicting competitive injury on IRI was a goal and purpose of defendants' alleged activities, and that the economic connection between the alleged violations and the effect on IRI is linear and short; nevertheless the fact that the primary injury fell on the foreign companies (who have rights to sue for whatever remedies the law applicable to them provides), together with the factors discussed above, leaves IRI without standing to sue for its derivative injuries.

\*        \*        \*        \*        \*        \*

Defendants' motion for partial summary judgment is granted. IRI's claims of injury suffered from defendants' activities in foreign markets where IRI operates through subsidiaries or companies owned by joint ventures, or "relationships" with local companies, are dismissed.

That ruling rested on acceptance of defendants' submission that, assuming antitrust violation, IRI lacks standing to sue (*id.* at 416):

... because it was not the person directly affected by the alleged conduct. Rather, the conduct allegedly harmed IRI's affiliates in Europe—separate corporate entities that are not parties to this suit. IRI was affected only in its capacity as a shareholder of, and supplier to, the European entities. It is hornbook law that the shareholder and supplier relationships are insufficient to confer standing.

The opinion clarifying the July 12, Order also stated (*ibid.*)

Not only where IRI shared in the subsidiary's losses as a partner, joint venture or shareholder, but also where its volume of sales to the subsidiary was diminished because of the subsidiary's

loss of business, IRI has no standing to sue, because (together with the other factors stated in the Order) IRI's injury is derivative of the antitrust injury inflicted on the subsidiary. Nor can IRI recover damages for weakening of its competitive position in the United States because of reduced revenue from its foreign subsidiaries. The deprivation of revenue, and the consequent inability to use the lost money to competitive advantage, amount to the same thing. The only value of money lies in the uses to which it can be put.

### The Present Applications

By a second motion for partial summary judgment, defendants seek dismissal of all claims regarding 22 foreign markets (the "remaining markets")[1] where IRI operated through affiliates, or which it was unable to enter because (IRI says) its antitrust injuries in other markets deprived it of the necessary resources. Defendants' motion rests on five grounds, that: (1) The court's prior orders bar derivative claims arising in markets where IRI operated through affiliates, (2) IRI would have entered many of the remaining markets through affiliates, (3) IRI was not prepared to enter those new markets, (4) IRI cannot show that defendants' conduct caused its failure to enter the Canadian or Mexican markets, and (5) the court lacks jurisdiction over claims that IRI was prevented from entering a foreign market if the failure to enter was caused by losses sustained by a European affiliate or the entity entering the market would have been an IRI subsidiary or affiliate (citing the Foreign Trade Antitrust Improvements Act, ("FTAIA") 15 U.S.C. § 6a).

In its cross-motion for reconsideration of the July 12, 2000 and February 6, 2001 Orders, IRI reformulates its claims of injury. Essentially, its present claims focus on disbursements it had to make in the United States to repair injuries inflicted on its foreign subsidiaries; it then seeks recovery not of the sums it was required to expend, but of the injuries IRI sustained in the domestic United States market because of the lack of those funds.

Thus, IRI stresses that it *"is not seeking to recover the money [it] claims to have diverted to cover the affiliates' losses"* (its counsel's Nov. 15, 2002 letter to court, p. 6; emphasis in original) and IRI:

> ... *is not* seeking to recover any of the following: 1) the profits on lost sales of retail tracking services in markets where IRI operated through subsidiaries; 2) the damages for the lost use of the profits it otherwise expected to obtain from its subsidiaries; and 3) the monies that IRI had to use to cover the operating losses in Europe caused by Defendants' conduct. (*id.*, p. 2, emphasis in original)

In its counsel's December 19, 2002 letter to the court, IRI at p. 1

> ... reiterates that by this claim it is only seeking to recover damages for the lost use of money that IRI expended from the U.S. and, but for Defendants' extra-territorial practices, would have used to compete against Defendants in the domestic market.

The following extracts give a summary of IRI's present claim, with its foreign components (*id.* pp. 2, 4–7, 8) (the paragraph numbers are omitted):

> The evidence establishes that by 1993, Defendants launched a series of coordinated, anticompetitive practices, both in the U.S. and abroad, to regain monopoly

---

1. Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, Hong Kong, Indonesia, Ireland, Korea, Luxembourg, Malaysia, Mexico, New Zealand, Norway, Philippines, Portugal, Singapore, Switzerland, Taiwan, and Thailand.

power in the domestic market for retail tracking services (the "U.S. Market"). These practices included: i) bundling retail tracking services in the U.S. with geographic markets where Nielsen had monopoly power; ii) predatorily pricing services in the U.S. Market; iii) informing IRI's U.S. clients, potential clients, financial analysts and third parties that IRI was financially unstable; and iv) draining IRI of U.S. resources and denying it access to the capital necessary to compete in the U.S. Market.

Draining IRI of U.S. resources was critical to the success of Defendants' attempted monopolization of the U.S. Market. Though IRI, through its new and innovative service, had been able to enter the domestic market which Nielsen long dominated, IRI did not possess Defendants' vast financial resources or geographic coverage. By draining IRI of U.S. resources and depressing its earnings, Defendants determined that they could financially cripple and outlast their smaller rival, as IRI attempted to expand into new geographic markets.

Defendants intentionally and systematically depleted IRI's U.S. resources by bundling and predatorily pricing services to customers in the U.S. Market, while simultaneously raising the cost of IRI's expansion into new geographic markets. Defendants fully appreciated that IRI could not afford to fend off an anticompetitive attack on its domestic business, while covering large, unanticipated losses in other geographic markets.

The calculated result of Defendants' extra-territorial practices was that IRI was forced to expend millions of dollars from the U.S. to cover excessive losses in markets into which IRI was attempting to expand. Because this money came from the U.S., it was then unavailable to compete against Defendants in the U.S. Market, just as Defendants had planned. . . .

The lost use of these resources caused IRI to lose millions of dollars in sales of domestic retail tracking services.

\*    \*    \*    \*    \*    \*

To increase the cost of IRI's geographic expansion, Defendants entered into a number of contracts with retailers that either inflated the cost to IRI of acquiring scanner data or denied IRI access to it altogether. For example, with a critical retailer in the U.K., Defendants dramatically increased data payments to that retailer, provided that it agreed not to sell its data to any other supplier for a lesser amount. The European Commission determined that through this clause Nielsen was able to raise IRI's entry costs.

In addition, Defendants offered contracts that discounted services in markets where Nielsen dominated if the customer purchased services in European markets that IRI was entering. . . .

These bundled contracts prevented IRI from selling its services to a critical market segment—multi-national customers. As the European Commission and Canadian Tribunal determined, once in a position to provide a retail tracking service, a supplier must have access to customer revenue to support entry and operating costs. By denying IRI access to multi-national customers, Defendants dramatically increased the losses that IRI had to cover from the U.S.

\*    \*    \*    \*    \*    \*

While IRI certainly planned to expend money from the U.S. to cover anticipated losses in new geographic markets, it expected that those markets would be profitable and would require no further cash infusions from the U.S. by 1997 at the latest. IRI did not expect that it

would have to cover the inordinate losses that Defendants' anticompetitive conduct caused. Nor did IRI expect that its joint venture partners would be unable to cover their share of these losses.

\* \* \* \* \* \*

IRI's expenditures from the U.S. to cover these losses have come in the form of capital contributions, loans made to the subsidiaries and the payment by IRI of its subsidiaries' production costs. [footnote omitted]

\* \* \* \* \* \*

To be clear, with respect to the capital contributions and loans, IRI typically wire transferred funds from its Harris Bank account in Chicago to the bank accounts of its subsidiaries in the countries identified above. With respect to the production costs, IRI did the work in the U.S. and shipped the data reports overseas. Regardless of the form of the expenditure, however, in each case IRI expended money from the U.S. to cover the losses in Europe caused by Defendants' anticompetitive conduct, which money would otherwise have been used to compete against Defendants in the U.S. Market.

\* \* \* \* \* \*

To fund the losses overseas, IRI was forced to sell its EXPRESS technology and line of software products to Oracle in July 1995. This netted IRI approximately $90 million which, along with U.S. profits, IRI expended from the U.S. to cover the excess losses that Defendants caused through their extra-territorial practices. Defendants described this as IRI selling the "crown jewels." Defendants announced that "by selling what many believe is the best and most profitable asset, and one long portrayed as their growth engine, IRI retains what may be the less attractive side of their business"—retail tracking services.

In addition, IRI had been able to stay ahead of its deep-pocketed rival in the U.S. Market by more quickly developing and bringing to market innovative products and services. The outflow ... from the U.S., because of Defendants' anticompetitive conduct, undermined IRI's ability to make capital improvements and invest in research and development that had been so critical to its early success. As a result, IRI has lacked funds to reengineer its operating and production systems and invest in new services.

In short, the lost use of money has inhibited IRI's ability to continue improving its systems and services to stay ahead of Defendants. Indeed, in 1994, as IRI's European losses were mounting, Defendants launched a communication strategy to inform customers that IRI would not be able to invest in research and development as it had before and that customers would be taking a risk by choosing a company that could no longer afford to support their technical needs.

The upshot, IRI asserts, undermined its ability to make improvements and invest in research and development, depressed its earnings and stock price, impaired its relationships with customers, creditors and key employees, and damaged its ability to compete with defendants in the domestic market and to engage in the remaining markets abroad.

Defendants regard IRI's revision of its claim as "a matter of semantics, not substance." They argue (Oct. 22, 2002 br. pp. 3, 42):

No matter how IRI seeks to describe them, its claims amount to the same thing: that the losses of the European affiliates allegedly deprived IRI of resources to compete in the U.S. and enter foreign markets. As we show, these are

derivative injuries that this Court correctly ruled IRI lacks standing to assert.

\*     \*     \*     \*     \*     \*

In any event, IRI's newly redrawn theory of injury in the United States from Defendants' conduct in the markets where IRI had affiliates is a distinction without a difference. It makes no difference whether IRI claims a lack of resources due to the loss of anticipated revenue from the European affiliates or because it chose to divert U.S. resources to cover the losses of the European affiliates resulting from Defendants' conduct in the European markets.

Defendants conclude in their Feb. 14, 2003 brief (p. 42):

> IRI's claim for the lost use of money that it allegedly paid to cover the affiliates' injuries is a derivative consequence of the harm to the affiliates. By IRI's own admission, its injury results from its relationship as a shareholder, creditor, and supplier of the European affiliates that were allegedly the direct victims of Defendants' conduct in the European markets in which the affiliates operated. IRI therefore lacks standing to assert claims for the lost use of the "diverted" money.

### Discussion

■ As stated in *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir.), *cert. denied*, 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996):

> In a "suit on a statute"—that is, a suit in which the statute itself grants the recovery, creates the jurisdiction, or permits special damages—the plaintiff must show both that he is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent. . . .
>
> . . . With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the "mischief" the statute sought to avoid.

The statute under which IRI sues, section four of the Clayton Act, 15 U.S.C. § 15(a), defines the protected class and the "mischief" broadly:

> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

■ As explained in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529–35, 103 S.Ct. 897, 904–7, 74 L.Ed.2d 723 (1983) Congress intended the Sherman Act (and thus the Clayton Act) to be construed in light of its common-law background, and therefore the question whether a plaintiff

> may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties cannot be answered simply by reference to the broad language of § 4. Instead, as was required in common-law damages litigation in 1890, the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them. (459 U.S. at 535, 103 S.Ct. at 907) (footnote omitted)

The *Associated General Contractors* Court elucidated in footnote 33 (*id.* at 536, 103 S.Ct. at 907) the limitations of labels such as direct and indirect injury, and the target area and zone of interest theories, which "may lead to contradictory and in-

consistent results," and concluded (*id.* at 535–37, 103 S.Ct. at 907–08):

There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of "proximate cause," and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages. It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing. In both situations the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances. (footnotes omitted)

Demonstrating the flexibility that should inform the exercise of that judgment, the Court quoted with approval (*id.* at 537, n. 34, 103 S.Ct. at 908):

What is a cause in a legal sense, still more what is a proximate cause, depend in each case upon many considerations.... What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.

(citation omitted)

Noting that an allegation of improper motive ("although it may support a plaintiff's damages claim under § 4") was not a panacea enabling any complaint to survive a motion to dismiss, the Court also recognized ( *id.* at 537, n. 35, 103 S.Ct. 908) that ... there no doubt are cases in which such an allegation would adequately support a plaintiff's claim under § 4. Cf. Handler, *supra* n. 33, at 30 (specific intent of defendant to cause injury to a particular class of persons should "ordinarily be dispositive" in creating standing to sue); [citing authorities].

Returning to this arena in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992) the Court described proximate cause as reflecting "ideas of what justice demands, or of what is administratively possible and convenient" (citation omitted). It stated (*ibid.*):

Accordingly, among the many shapes this concept took at common law, see *Associated General Contractors, supra,* 459 U.S., at 532–533, 103 S.Ct., at 905–906, was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover. See, *e.g.,* 1 J. Sutherland, Law of Damages 55–56 (1882).

Even in that description, the Court made clear that the term "direct" was not a standard in itself, but a shorthand for the elements of a further analysis. It stated (*id.* at 272 n. 20, 112 S.Ct. at 1320):

Thus, our use of the term "direct" should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached.

Summarizing those elements, as established and applied in *Associated General Contractors* and in the *Holmes* decision itself, the Supreme Court identified three requirements underlying and comprising the substance of the concept of "direct" injury (*id.* at 269–70, 112 S.Ct. at 1318–19):

First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely. (citations omitted)

█ Thus, it is that analysis which must be applied to IRI's present claim of damages. These policy considerations determine recovery by the plaintiff, rather than epithets such as "indirect" or "derivative." See *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., et al.,* 191 F.3d 229, fn. 4, p. 239 (2d Cir.1999), *cert. denied,* 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000) ("the outer limits of the direct injury test are described more by those concerns than by any bright-line, verbal definition").

### 1. Difficulty of Determining Portion of Damages Allocable to Violation As Distinct from Other Factors, *e.g.,* Poor Business Practices

There is no reason to assume that this presents any insuperable difficulty.

Defendant claims that IRI must show, in addition to proof that defendants' conduct in each of the separate markets was anticompetitive:

(a) the size of the losses in each separate European market attributable to the alleged anticompetitive conduct, as distinct from losses normally experienced by new businesses, as well as losses due to mismanagement, misjudgment, or ordinary business conditions.

(b) how the money IRI allegedly diverted to cover such losses would otherwise have been allocated to establish new retail tracking businesses in the remaining 22 foreign markets or to compete with ACNielsen in the United States, as opposed to the many other uses to which the money could have been put, such as investing in the existing European affiliates that had just entered the largest European markets. Given the many different uses to which IRI put its money and the many different factors that go into making investment decisions, any claim as to what portion, if any, of the lost revenues or resources would have been invested to establish retail tracking businesses in each of the 22 separate and different new foreign markets or to strengthen IRI's U.S. retail tracking business is highly speculative.

... what amount of profit, if any, IRI would have earned in those markets as a result of such investments.

(Oct. 22, 2002 Memorandum Supporting Motion, pp. 47–8)

These issues are contested and will be hard fought at trial (See Defs.' Feb. 14, 2003 brief, pp. 18–33), but that does not justify their summary dismissal as a matter of law. As this court previously ruled (127 F.Supp.2d 411 at 415),

the defendants claim "[a]ny damages flowing to IRI are speculative because they require measurement first of the impact on its foreign affiliates and second the derivative impact on IRI." Def.'s Mem. at 13. It would probably be feasi-

ble, however, to calculate IRI's damages with the relaxed degree of precision required for computations of lost revenues in antitrust cases....

The reformulated damage claim will be based on outlays and injuries experienced in the United States, expressed in figures which plaintiff has already supplied to the court and defendants. In *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1023 (6th Cir.1999) the court reversed dismissal of a damage claim of almost equivalent complexity (*id.*):

> Here, however, the franchisor-plaintiffs have standing to pursue their claims. First, they have provided sufficient evidence that they suffered an antitrust injury caused by the defendants' anticompetitive conduct. Through the implementation of adverse splits, the defendants prevented Re/Max agents from earning their normal commission on most transactions, which in turn prevented Re/Max's 100% Concept from functioning, which prevented Re/Max from attracting top agents, which prevented Re/Max franchises from succeeding, which prevented Re/Max from earning revenue from those franchises and agents and from opening new franchises. While this chain of causation may be long, it is direct and unbroken.

Notwithstanding its steps and elements, the factual validity of plaintiff's new damage theory should be tested by trial.

## 2. Difficulty Apportioning Damages Among Injured Parties

The sole potential plaintiff whose chances of expansion in the United States and foreign markets were injured by the alleged violations is IRI, defendants' only competitor. IRI's subsidiaries cannot sue for IRI's loss of use of its domestic expenditures, or the loss of its business opportunities.

The argument most heavily relied upon by defendants is that IRI's claimed injuries are derivative of those inflicted upon its foreign subsidiaries, and thus threaten either a complex process of disentanglement or duplication of recovery by the subsidiaries and the derivatively-injured IRI. The concept is stated with clarity in *Commercial Cleaning Services v. Colin Service Systems, Inc.*, 271 F.3d 374, 383 (2d Cir.2001):

> The point made in *Holmes* was that, if damages are paid both to first tier plaintiffs—those directly injured by defendant's alleged acts—and to second tier plaintiffs—those injured by the injury to the first tier plaintiffs—then the payment of damages to the first tier plaintiffs would cure the harm to the second tier plaintiffs, and the payment of damages to the latter category would involve double compensation.

Adopting the above language, in this case payment of damages to the first tier plaintiffs (the foreign subsidiaries) would not cure the harm to IRI.

Recoupment by the subsidiaries of their injuries would restore the revenue whose loss IRI was claiming in its original theory of damages. Primarily for that reason, IRI's claim for deprivation of revenue from the subsidiaries was denied. *IRI v. Dun & Bradstreet*, 127 F.Supp.2d 411, 415–16 (S.D.N.Y.2000).

IRI's current theory addresses different damages, which were originally sustained in the United States. IRI now complains, not of revenue unreceived, but of disbursements required and burdens imposed on its competitive ability here. Although (it claims) its injuries were administered through the subsidiaries as vehicles, the purpose and effect of defendants' foreign activity was to inflict, in the United States, precisely the injuries for which IRI now claims damages. With respect to its pres-

ent claims, the financial impact appeared first on IRI's books in the United States. It lost the use of its money and assets, and experienced the resulting loss of competitive capacity, directly in the United States—just as defendants planned. See *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 294 (2d Cir.1983) (Friendly, C.J.), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984):

> Injury to Crimpers was the precisely intended consequence of defendants' boycott; with respect to that act the injury to Crimpers was even more "direct" than to the producers or stations who defendants concede would have standing.

Thus, this case is an apt one for application of the Second Circuit's statements in *Commercial Cleaning,* 271 F.3d at 382 and 384, that a plaintiff has standing where it is a direct competitor against a defendant, and is the direct target of the violation.

### 3. Ability of Others to Sue

As noted above, no other plaintiff was forced to make the outlays, or sell the assets, that IRI was.

The subsidiaries may sue for their injuries (although not here, see 127 F.Supp.2d 411, 416–17). But no other entity can sue for the resulting antitrust damage to IRI here, intentionally inflicted by its direct competitor.

Naturally the question arises, if the subsidiaries sued and all their injuries were compensated, and the money flowed through to IRI (with appropriate interest), wouldn't IRI's harm be cured? A ready example demonstrates the difference between the subsidiaries' injuries and IRI's claim. That money would not restore to IRI its "crown jewels," the EXPRESS technology which it was forced to sell, (and which defendants described as "its best and most profitable asset," see p. 7 above),

nor the profits EXPRESS would have furnished to IRI. No subsidiary can sue for that loss. Although the loss may be described as derivative, there is no double compensation for it.

*Preparedness to Enter Foreign Markets*

The admissibility of IRI's claims that it was defendants' actions which depleted IRI's competitive resources sufficiently answers, for summary judgment purposes, defendants' argument that IRI cannot claim injuries in foreign markets it was not prepared to enter.

IRI's counsel's March 11, 2003 letter to the court states (p. 4) that IRI does not "seek to recover the profits its subsidiaries lost in markets in which they operate." See also the similar statements quoted at pp. 4–5 above.

■ To the extent that IRI's damage calculation claims a share in defendants' total revenues, including their foreign revenues, IRI has sufficiently for summary judgment purposes shown that it would have entered the foreign markets if defendants' violations had not deprived it of the ability to do so. See *In re Independent Service Organizations Antitrust Litigation,* 964 F.Supp. 1454 at 1466–67 (D.Kan. 1997). Plaintiff's showings concerning Canada and Mexico also suffice to bring them within this standard.

*Foreign Trade Antitrust Improvements Act*

■ The necessity, intentionally imposed on IRI by defendants' foreign and domestic activities, to devote the use of millions of dollars of its domestic funds to purposes other than its chosen ways of competing, was a "direct, substantial and reasonably foreseeable effect" on domestic trade or commerce and gave rise to a claim of attempted monopolization. Thus, the Foreign Trade Antitrust Improve-

ments Act, 15 U.S.C. § 6a, does not exempt IRI's present claim from the antitrust laws.

*Conclusion*

Defendants' motion for partial summary judgment dismissing all claims regarding the remaining foreign markets is denied.

Plaintiff's motion for reconsideration of the July 12, 2000 and February 6, 2001 orders is also denied, except to the extent that the broad language in the order and judgment (dismissing "claims of injury suffered from defendants' activities in foreign markets where IRI operates through subsidiaries or companies owned by joint ventures, or 'relationships' with local companies") is confined to its proper scope: the claims before the court at that time, of reduced revenues from the foreign subsidiaries. It does not apply to plaintiff's present claim as set forth in its counsel's November 15 and December 19, 2002 letters to the court.

So ordered.